**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Humana Inc.,<br><br>Plaintiff<br><br>v.<br><br>Monsanto Company, and Bayer AG,<br><br>Defendants | Civil Action No. |

**COMPLAINT FOR DECLARATORY JUDGMENT AND DOUBLE DAMAGES PURSUANT TO THE MEDICARE SECONDARY PAYER ACT**

I. INTRODUCTION ....... 1

II. PARTIES ....... 6

III. JURISDICTION AND VENUE ....... 7

IV. REGULATORY BACKGROUND ....... 7

A. Overview of Medicare. ....... 7

B. Medicare Advantage Organizations and the Medicare Secondary Payer Act. ....... 8

V. FACT ALLEGATIONS ....... 13

A. Monsanto enters into the 2020 settlement agreements. ....... 14

B. Monsanto enters into supplemental settlements with 77,000 claimants. ....... 16

C. The proposed 2026 Roundup settlement ....... 17

D. Monsanto and Bayer are "primary plans" who have, and will in the future, make settlement payments in connection with obtaining a release of liability. ....... 25

E. Monsanto has failed to address its obligations to Medicare Advantage Organizations. ....... 28

VI. CLAIMS ....... 35

This action against Monsanto Company and Bayer AG (sometimes collectively referred to as "Monsanto") seeks declaratory and monetary recovery for Medicare payments made for the Non-Hodgkin Lymphoma ("NHL") related care of Medicare Advantage members exposed to Roundup with whom Monsanto has settled, or plans to settle, personal injury claims.

## I. INTRODUCTION

1. Humana is one of the largest Medicare Advantage Organizations in the United States. It brings this suit under the Medicare Secondary Payer Act. The Medicare Secondary Payer Act imposes upon tortfeasors, such as Monsanto, the obligation to ensure that the costs incurred by health plans for treating injuries caused by the tortfeasors' products be borne by that tortfeasor and not by the Medicare system or health plans operating under it. Monsanto's attempt to shift this obligation from itself onto the shoulders of the very individuals who were harmed by its Roundup product is improper. Humana seeks a declaration that its rights to reimbursement under the Medicare Secondary Payer Act have not been, and cannot (unless Humana expressly agrees) be, compromised or impaired by any settlement agreements entered into by Monsanto or Bayer with individuals harmed by Monsanto's Roundup product. Humana also seeks to recover: (a) reimbursement of the money Medicare Advantage Organizations paid on behalf of their members for Roundup-related injuries suffered by those members, including Non-Hodgkin

Lymphoma (NHL)-related care; and (b) damages for defendant Monsanto's failure to pay such reimbursements.

2. For over five years, Monsanto and Bayer have entered a series of settlements resolving over 100,000 Roundup-related injury claims (collectively referred to as the "2020 Roundup Settlements"). Public reports have put the total number of dollars paid under these settlements at over $10 billion. A substantial segment of the claimants subject to the 2020 Roundup Settlements participated in private lien resolution programs (and one-off resolutions) to resolve Medicare and other healthcare lien obligations with healthcare insurers. Private lien resolution programs (or "LRPs") are agreements consensually reached between private health plans, tortfeasors, settling claimants, and plaintiffs' counsel to efficiently and fairly resolve medical liens. However, the 2020 Roundup LRP was voluntary in the sense that individual claimants were not required by the terms of the settlement to join the 2020 Roundup LRP and health plans participating in the 2020 Roundup LRP did not receive any master settling claimant list. If a settling claimant chose not to submit their claim to the 2020 Roundup LRP, and did not otherwise reach an agreement with their health plan, they may have unsatisfied lien obligations. To the extent that Monsanto or Bayer failed to ensure that Humana's medical liens were satisfied from the proceeds of those settlements, Monsanto and Bayer remain liable to Humana under the Medicare Secondary Payer Act for double the amount Humana paid.

3. Recently, Monsanto and Bayer announced a proposed class settlement (the "2026 Settlement Agreement") under which Monsanto and Bayer agreed to fund a settlement for claimants who were exposed to Roundups. Many of these claimants were, are, or could be, Medicare Advantage members.[1] In fact, class counsel's hand-selected Healthcare Compliance Administrator has stated in a declaration that "Medicare is expected to have provided coverage for a majority of Settlement Class Members."

4. Yet, in violation of the statutory protections under the Medicare Secondary Payer Act, the 2026 Settlement Agreement fails to ensure that MAOs will be reimbursed for their payments. It also fails to establish a functional lien resolution program. Instead, the settlement purports to move the financial risk away from Monsanto and onto individual cancer patients, while assigning only general responsibilities to a Healthcare Compliance Administrator. That approach departs from standard mass-tort lien resolution practices such as the aforementioned LRPs, which use claimant data, matching procedures, clear deadlines, lien audit

[1] Medicare Advantage is a program through which private insurance companies (referred to as Medicare Advantage Organizations, or MAOs) contract with the federal government to provide healthcare. The percentage of Medicare claimants covered by Medicare Advantage has been steadily increasing, from 42% in 2020 to 55% in 2026. *See, e.g.,* Meredith Freed et al., *Medicare Advantage in 2026: Enrollment Update and Key Trends*, KFF (Jun. 5, 2026), https://www.kff.org/medicare/medicare-advantage-in-2026-enrollment-update-and-key-trends/ [hereinafter Kaiser Report].

mechanisms, and uniform criteria to resolve payor claims before settlement funds are distributed. Such private lien resolution programs have been used successfully to resolve liens in dozens of prior mass torts, including the prior 2020 Roundup Settlements. And when appropriately structured, most health plans (including Humana) voluntarily join them to efficiently resolve lien obligations. The proposal in the 2026 Settlement Agreement would artificially, and unlawfully, force a "cap" on lien recoveries, including liens held by Humana. As a result, the 2026 Settlement fails to ensure Humana's (and many other MAOs) liens will be fully resolved.

5. Monsanto and Bayer seek to obtain releases of Roundup-related claims without reimbursing Humana, or other Medicare Advantage Organizations that bore those costs. Without a declaration of the parties' rights, including confirmation of Monsanto and Bayer's liability to Humana if the lien obligations are not satisfied, there is a risk of real and immediate harm to Humana.

6. Humana has paid, and continues to pay, for medical care for many of its Medicare Advantage members exposed to Roundup. Thousands of these have previously settled Roundup-related claims. And thousands of others are likely in the pool of settling claimants whose claims will be resolved under the 2026 Settlement Agreement. A preliminary investigation, based on very limited publicly available information, has revealed at least 12 Humana Medicare Advantage members who sued years ago, and thus may have been parties to one of the prior Roundup

settlements, but have not satisfied their lien obligations (which collectively exceed $800,000). And at least 14 additional Humana Medicare Advantage members with Roundup claims are represented by class counsel have been recently identified.[2] These individuals are almost certainly in the proposed settlement class under the 2026 Settlement Agreement (in fact, one appears to be a named class representative in the *King v. Monsanto* action pending in Missouri state court), and will be receiving compensation from Monsanto and/or Bayer for their NHL-related injuries.[3] Humana has already spent over $157,000 providing medical benefits and healthcare to those members in connection with their NHL-related treatment, and is continuing to provide such benefits. Given Humana's overall share of the Medicare Advantage market, and the number of Medicare members covered by the 2026 Settlement Agreement, there are almost certainly many more.

7. This complaint is filed to address Monsanto and Bayer's failure to satisfy their obligations under the Medicare Secondary Payer Act as to any settlement they have consummated and for which Humana's lien obligations were not satisfied. Under the Medicare Secondary Payer Act, they are liable to Humana

---

[2] As discovery proceeds, and after an appropriate protective order is in place, the specific identities of these settling claimants covered by Humana can be provided.

[3] At least a dozen of these 14 claimants have 'active' complaints pending. Three have recently had their cases closed, but the circumstances of that are unknown. None of these 14 Roundup claimants have satisfied lien obligations owed to Humana.

for damages equal to double the amounts Humana paid to treat Medicare Advantage Roundup claimants.

## II. PARTIES

8. Humana Inc. is a Delaware corporation with its principal place of business in Louisville, Kentucky. Humana provides medical benefits to roughly 26% of the Medicare Advantage market. Humana has provided, and likely is continuing to provide, medical care to Medicare Advantage members who have settled Roundup-related claims for which Humana has not been reimbursed.

9. To date, through independent investigation Humana has identified from public court dockets of Roundup-related cases the identity dozens of Medicare Advantage members for whom Humana has paid Roundup-related medical expenses but for whom no lien obligations have been satisfied. Some of these members are represented by class counsel seeking approval of the 2026 Settlement Agreement.

10. Defendant, Monsanto Company ("Monsanto"), is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto is a wholly owned subsidiary of Bayer AG.

11. Defendant, Bayer AG ("Bayer") is headquartered in Leverkusen, Germany. Its North American operations are overseen by Bayer U.S. LLC, a Delaware corporation with its headquarters and principal place of business in Whippany, New Jersey.

## III. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Humana's claims arise under federal law.

13. This Court also has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because Humana is completely diverse from the Defendants Monsanto and Bayer, and the amount in controversy on Humana's claims alone exceeds $75,000, exclusive of costs.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, among other reasons, Bayer's North American operations are overseen by Bayer US, LLC which has its principal place of business here.

## IV. REGULATORY BACKGROUND

### A. Overview of Medicare.

15. Medicare is a system of federally funded health insurance for people 65 and older and individuals suffering from certain diseases. Medicare is governed by Title XVIII of the Social Security Act ("Medicare Act"). 42 U.S.C. § 1395 et seq. The Medicare Act is divided into five "Parts."

16. Medicare Part A, 42 U.S.C. § 1395c et seq., provides insurance coverage for costs of inpatient hospital and other services, and is generally available without payment of premiums to most persons who paid Medicare payroll taxes before becoming Medicare eligible.

17. Medicare Part B, 42 U.S.C. § 1395j et seq., is a voluntary program in which the beneficiary pays premiums to Medicare, and in return Medicare pays the costs of medically-necessary outpatient services, such as doctor's office visits and home health care.

18. Medicare Part C, 42 U.S.C. § 1395w-21 et seq., is a voluntary program in which the beneficiary receives all benefits provided under Medicare Parts A and B, plus some additional benefits. Health benefit plans offered under Medicare Part C are known as "Medicare Advantage Plans," and they are administered by Medicare Advantage Organizations. Humana operates a Medicare Advantage Organization.

19. Medicare Part D, 42 U.S.C. § 1395w-101 et seq., is the voluntary prescription drug benefit program, added in 2003.

20. Medicare Part E, 42 U.S.C. § 1 395x et seq., contains definitions and general provisions applicable to the whole of the Medicare program. The Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b), is codified in Part E.

**B. Medicare Advantage Organizations and the Medicare Secondary Payer Act.**

21. Individuals enrolled in Medicare Part C obtain their Medicare benefits through private insurers, referred to as Medicare Advantage Organizations, rather

than receiving benefits from the federal government under Medicare Parts A and B.[4] The federal agency responsible for overseeing Medicare, Centers for Medicare and Medicaid Services (CMS), pays a fixed amount for each member to the Medicare Advantage Organization. The Medicare Advantage Organization then administers Medicare benefits for its members and bears the risk associated with insuring them. Medicare Advantage Organizations like Humana are responsible for paying the covered medical expenses of their members.[5]

22. In 1980, Congress enacted the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b), which provides for the coordination of benefits between primary and secondary payors. When Medicare pays for treatment of a a member, and there is also a "primary plan," Medicare's payment is conditional. This means that the primary plan, and any entity that receives payment from a primary plan, must reimburse Medicare for benefits it conditionally provided.

23. In 2003, Congress amended the Medicare Secondary Payer Act to make clear that tortfeasors like Monsanto and Bayer that self-insure and "[carry their] own risk" for liability are "primary plans" under the Medicare Secondary Payer Act.[6]

---

[4] 42 U.S.C. § 1395w–21(a).

[5] *In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.,* 685 F.3d 353, 357-358 (3d Cir. 2012).

[6] 42 U.S.C. § 1395y(b)(2)(A).

This amendment reflected Congress' clear intention to make tortfeasors liable under the Medicare Secondary Payer Act.

24. A primary plan includes a "liability insurance policy or plan (including a self-insured plan)."[7] A "self-insured plan" includes "a business trade or profession . . . if it carries its own risk (whether by a failure to carry insurance, or otherwise), in whole or in part" for payment of medical expenses.[8] When a self-insured tortfeasor, or its liability insurer, is responsible to make a payment under a primary plan, they are "primary payers" under Medicare, and the payment is a "primary payment."[9]

25. The Medicare Secondary Payer Act provides that, "A primary payer, and an entity that receives payments from a primary payer, must reimburse CMS for any payment if it is demonstrated that the primary payer has or had a responsibility to make payment."[10] A primary payer's responsibility for payment may be demonstrated by "[a] payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of

[7] 42 U.S.C. § 1395y(b)(2)(A)(ii).

[8] *Id*.

[9] 42 C.F.R. § 411.21.

[10] 42 C.F.R. § 411.22(a).

payment for items or services included in a claim against the primary payer or the primary payer's insured" or by settlement.[11]

26. Once a primary payer's reimbursement obligation is demonstrated, CMS and MAOs have the right to maintain an action to recover conditional payments from the primary payer or from any entity that received a primary payment.[12]

27. The primary payer remains ultimately responsible for reimbursing conditional payments made by MAOs even if the individual member had agreed to make payment from their settlement funds.

28. If an individual covered by Medicare receives a settlement payment, and CMS or the MAO who provided related medical payments is not reimbursed within 60 days, "the primary payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party."[13] In this manner, the Secondary Payer Act authorizes CMS or an MAO to recover double damages from responsible

[11] 42 C.F.R. § 411.22(b)(2) & (3).

[12] 42 C.F.R. § 411.24(g); 42 U.S.C. § 1395y(b)(2)(B)(iii).

[13] 42 C.F.R. § 411.24(i)(1) ("If Medicare is not reimbursed [by the covered member within 60 days of receiving a settlement payment] as required by paragraph (h) of this section, the primary payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party.").

parties, including primary payers such as Monsanto and Bayer, when they make settlement payments and do not account for liens held by MAOs.[14]

29. Humana is certified by CMS as a Medicare Advantage Organization, as that term is defined in 42 C.F.R. §422.2. Medicare Advantage Organizations are licensed by states as "risk-bearing entities" and Humana the right to recover under the Medicare Secondary Payer Act.[15]

30. Humana is required to comply with the Medicare Secondary Payer Regulations. Those Regulations are designed to ensure that Medicare does not pay, or is reimbursed for payments it does make, for medical expenses that are paid, or could be paid, by their members' "primary plans."

31. CMS pays Medicare Advantage Organizations from the Medicare Trust Fund. Therefore, when Medicare Advantage Organizations, such as Humana, are reimbursed by or recover damages from primary payers or other liable parties under the Secondary Payer Act, it helps reduce Medicare expenditures by the Medicare Trust Fund. Reimbursement recoveries by Medicare Advantage Organizations fulfill

---

[14] 42 U.S.C. §§ 1395y(b)(2)(B)(iii), (b)(3)(A).

[15] *In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.*, 685 F.3d 353, 359 (3d Cir. 2012) (The Medicare Secondary Payer Act "establishes 'a private cause of action for damages' and places no additional limitations on which private parties may bring suit. § 1395y(b)(3)(A). Accordingly, we find that the provision is broad and unambiguous, placing no limitations upon which private (i.e., non-governmental) actors can bring suit for double damages when a primary plan fails to appropriately reimburse any secondary payer.")

the essential purpose of the Medicare Secondary Payer Act, which is to shift expenses from Medicare and/or Medicare Advantage Organizations to primary plans.

32. According to CMS enrollment data, there are currently more than 35 million people enrolled in Medicare Advantage.[16] This number has been steadily increasing, and more than half all Medicare beneficiaries have enrolled in Medicare Advantage plans since 2023.[17]

## V. FACT ALLEGATIONS

33. Through a series of past and contemplated settlements for Roundup-related personal injury claims, Monsanto and Bayer have assiduously avoided their independent obligations as primary payers to make payments to, or ensure payments are made to, Humana under the Medicare Secondary Payer Act. And under a proposed 2026 settlement of Roundup-related claims, Monsanto and Bayer purport to resolve claims under terms that seek both to avoid their independent obligation to make payments to Humana under the Act and to undermine the ability of Humana (and other MAOs) to recover such payments from claimants.

[16] *See, e.g.,* Jeannie Fuglesten Biniek et al., *Medicare Advantage Enrollment Grew by About 1 Million People, Mainly Due to Special Needs Plans*, KFF (Feb. 23, 2026), https://www.kff.org/medicare/medicare-advantage-enrollment-grew-by-about-1-million-people-mainly-due-to-special-needs-plans/.

[17] Kaiser Report, *supra* note 1.

**A. Monsanto enters into the 2020 settlement agreements.**

34. Monsanto manufactures Roundup, a popular herbicide, which it has advertised and sold for decades throughout the United States, including in this district. The active ingredient in Roundup, glyphosate, has been associated with cancer risks. This connection has prompted hundreds of thousands of individuals to sue Monsanto (now owned by Bayer) since 2015.

35. In 2020, Bayer announced a series of agreements to resolve a number of litigations, including agreements to resolve around 75% of the roughly 125,000 then-pending claims asserting personal injuries caused by Roundup.[18]

36. In connection with the 2020 Roundup Settlements, many health plans, including Humana, participated in private lien resolution programs (the "2020 Roundup LRPs") that established an efficient process for resolving medical liens related to settling claimants.[19] The 2020 Roundup LRPs were voluntary and required participating claimants to submit their names and certain demographic information. For claimants and counsel who participated, the LRPs successfully and efficiently

[18] Press Release, Bayer, *Bayer Announces Agreements to Resolve Major Legacy Monsanto Litigation* (June 24, 2020), https://www.bayer.com/media/en-us/bayer-announces-agreements-to-resolve-major-legacy-monsanto-litigation/.

[19] Plaintiffs who settled claims under any of the 2020 Roundup Settlements, the 2026 Settlement Agreement, or any other settlement relating to alleged Roundup injuries, are referred to herein generally as "Roundup claimants."

resolved liens. Negotiated lien reductions and caps benefited claimants, while agreed-upon processing requirements facilitated the resolution process.

37. However, the 2020 Roundup LRPs were voluntary; if a settling claimant (or their law firm) did not submit their information, their lien obligations were not resolved under the 2020 Roundup LRPs. On information and belief, while most 2020 Roundup settling claimants participated in the 2020 Roundup LRPs, some Medicare beneficiaries that have resolved their claims under the 2020 Roundup Settlements did not participate in the 2020 Roundup LRPs nor otherwise resolve their payment obligations under the Medicare Secondary Payer Act.

38. Under the 2020 settlements, Monsanto did not independently discharge its primary-payer obligations by making payments to MAOs. Nor did Monsanto itself provide information to MAOs to ensure that MAOs such as Humana knew the identities of all members with whom Monsanto was settling Roundup-related claims for which Medicare payments may have been made. And due to the voluntary nature of the 2020 Roundup LRP, those settlements did not ensure that all lien obligations were satisfied. As a result, to the extent that Monsanto and Bayer settled a Roundup-related claim with a Humana Medicare member for whom Humana has not resolved a Medicare Secondary Payer Act lien (either through the 2020 Roundup LRP or otherwise), Monsanto and Bayer are obligated to pay Humana the full payable lien, doubled under the Act.

39. In October 2022, Bayer announced that William Dodero, identified as a key player in managing the company's costly legal fights over Roundup, would be taking over as the company's United States General Counsel in January 2023. In that role, Mr. Dodero oversees legal areas in the company's Whippany, New Jersey United States headquarters.

**B. Monsanto enters into supplemental settlements with 77,000 claimants.**

40. Monsanto and Bayer continued to settle personal injury claims based on exposure to Roundup. These include at least two settlements with individual law firms covering approximately 77,000 Roundup claims.

41. On information and belief, the settlements for the 77,000 Roundup claims also only provide—if they provide at all—for voluntary participation in lien resolution of Medicare Secondary Payer Act liens. To date, Monsanto and Bayer have not independently sought to discharge their primary-payer obligations by making payments to, or making plans to make payments, to MAOs. Nor have Monsanto and Bayer provided, or made plans to provide, information to MAOs to ensure that MAOs such as Humana know the identities of all members with whom Monsanto was settling Roundup-related claims for which Medicare payments may have been made.

42. Upon information and belief, Monsanto and Bayer did not include any provisions in any of the 2020 settlements, the two more recent settlements, or any

other settlement they entered that required the full satisfaction of private medical liens, including those arising from Humana's payment of medical benefits under Medicare Advantage. To the extent settling claimants under any of these settlements did not participate in the 2020 Roundup LRP and did not otherwise reimburse Humana, their lien obligations to Humana were not satisfied. And to the extent any such claimants have received compensation in exchange for a release under any of those settlements, Monsanto and Bayer are liable to Humana for double the amount of Humana's payments.

**C. The proposed 2026 Roundup settlement**

43. On February 17, 2026, several individuals (from multiple U.S. states) filed a class action lawsuit in Missouri state court against Monsanto. These individuals were Randall King (diagnosed with Follicular Lymphoma at the age of 72); Scott Butterfield (diagnosed with Hairy Cell Leukemia at the age of 56); Bruce Waldman (diagnosed with Follicular Lymphoma at the age of 78); Robert Koehler, and Michael Merx (both "futures" claimants who have not yet been diagnosed with any disease).

44. They allege that Monsanto did not warn agricultural workers, home gardeners, and others about the cancer risks associated with Roundup products.[20] In

[20] Class Action Petition, *King v. Monsanto Co.,* No. 2622-CC00325 (Mo. Cir. Ct. St. Louis City Feb. 17, 2026).

filing this complaint, plaintiffs sought to "represent all individuals who have been [e]xposed to Roundup Products and either have been diagnosed with [non-hodgkin lymphoma] NHL or may be diagnosed with NHL in the future due to their [e]xposure to Roundup Products, thus ensuring comprehensive compensation for the full scope of harm caused by Monsanto's conduct."[21]

45. On the same day, Monsanto and counsel for the proposed class of Roundup claimants entered into the 2026 Settlement Agreement related to personal injury claims against Monsanto for the development of NHL caused by use of Roundup.[22]

46. In a press release issued that same day, Mr. Dodero (now serving as Bayer's Global Head of Litigation and Head of Law, Patents, and Compliance North America) explained how the 2026 Settlement Agreement had been negotiated and what Bayer believed it achieved.[23]

---

[21] Class Action Petition at 4.

[22] Unopposed Motion for Entry of the Preliminary Approval Order and Suggestions in Support, *King v. Monsanto Co.,* No. 2622-CC00325 (Mo. Cir. Ct. St. Louis City). On June 24, 2026, the parties filed a Joint Notice Regarding the Corrected Settlement Agreement. This revised settlement agreement makes no changes to the sections of the agreement that have led to the allegations in this complaint.

[23] Press Release, Bayer, *Bayer Investor and Media Update* (Feb. 17, 2026), https://www.bayer.com/media/en-us/bayer-investor-and-media-update-english-version/ [hereinafter Bayer Investor Update].

47. Monsanto and Bayer are paying the defense and indemnity costs incurred in connection with the Roundup litigation and 2026 Settlement Agreement. To fund the payments under the 2026 Settlement Agreement, Bayer secured a bank loan facility of roughly $8 billion, and announced plans to use a combination of assets, including senior bonds and instruments receiving equity-credit by rating agencies, to ensure ultimate financing of the settlement.[24]

48. The 2026 Settlement Agreement identifies class members as those exposed to Roundup and categorizes them into two groups: (1) individuals diagnosed with Non-Hodgkin Lymphoma and (2) individuals not diagnosed with Non-Hodgkin Lymphoma.[25]

49. The 2026 Settlement Agreement releases provide that each claimant "fully, finally, and forever releases and discharges" Monsanto and Bayer, and all manufacturers of Roundup, from "Roundup Claims."[26] The 2026 Settlement Agreement further "fully, finally, and forever releases and discharges the Monsanto Parties and the Related Parties, from any and all Claims, arising from, resulting from,

---

[24] Press Release, Bayer, *Monsanto Announces Roundup Class Settlement Agreement to Resolve Current and Future Claims* (Feb. 17, 2026), https://www.bayer.com/media/en-us/monsanto-announces-roundup-class-settlement-agreement-to-resolve-current-and-future-claims/ [hereinafter Bayer Feb. 2026 Press Release].

[25] Settlement Agreement §§ 2.1 and 2.2.

[26] Settlement Agreement § 3.1(a), as well as §§ 1.1 (78) (Non-Hodgkin Lymphoma), (100) (Related Parties), (107) (Roundup Claims).

in any way relating to, or in connection with: (i) any claim for benefits under the 2026 Settlement Agreement, including any consequences in the event that the 2026 Settlement Agreement impacts, limits, or precludes any [Roundup claimant's] right to benefits under Social Security, Medicare, or Medicaid, or from any Government Payor or Other Insurer."[27] The agreement defines "other insurer" as "any Person other than a Governmental Payor, …that is obligated under contract, agreement or otherwise, to pay health care costs of a Settlement Class Member, including, without limitation, a self-insured plan operated by an employer or a corporate or association health insurer or liability insurer."[28]

50. The releases being given by the settling plaintiffs to Monsanto and Bayer under the 2026 Settlement Agreement are conditioned upon the settling plaintiff's compromise, waiver, or release of their Roundup-related claims against Monsanto and Bayer. And those claims specifically include claims for, *inter alia*, past and future medical care.

---

[27] Settlement Agreement § 3.1 (d) (Release of Claims Related to Liens).

[28] Settlement Agreement § 1.1(83). The Settlement Agreement also acknowledges that, even though it contemplates claimants who may have future medical bills, it does not release any insurer "from its obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or for any Claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities." Settlement Agreement § 3.4.

51. The 2026 Settlement Agreement, in multiple parts, acknowledges that Roundup claimants are likely subject to the Medicare Secondary Payer Act[29] and potential liens by Medicare Advantage Organizations.[30]

52. Under the 2026 Settlement Agreement, Monsanto and Bayer assiduously seek to avoid taking any actions to discharge their independent obligations under the Medicare Secondary Payer Act to make primary-plan payments to MAOs, including Humana. Instead, the agreement places the onus on Roundup claimants (and their counsel) to identify and pay private health care liens, including Medicare Part C and D liens.[31]

53. For "Government Payors" the 2026 Settlement Agreement creates a procedure for obtaining "written agreements" from "each Government Payor" to

[29] Settlement Agreement §1.1(77) ("MSP Laws"). Though a defined term, the MSP laws are never mentioned in the agreement or any of its exhibits.

[30] *See e.g.* Settlement Agreement §§ 1.1(73) ("Lien"),

[31] *See e.g.* Settlement Agreement §§ 6.3(a)(x) ("an authorization for the Administrator and HCA, consistent with HIPAA and other applicable privacy laws, to verify facts and details of any aspect of the Claims Package or the existence and amounts, if any, of any Liens"); 6.3(c)(viii) ("information required by the Administrator, the Allocation Special Master, or the HCA regarding Liens"); 18.1(d) ("As a further condition of applying for and receiving an Award, a Settlement Class Member must (i) identify in writing any Lien other than a medica-based Lien imposed by a Governmental Payor or Other Insurer disclosed pursuant to Section 18.1(a)(iii), and (ii) represent and warrant in writing he or she has used best efforts to identify such other Liens.").

resolve any liens.[32] The 2026 Settlement Agreement acknowledges that these procedures do not cover Medicare Part C plan sponsors.

54. Those same procedures are not created for the "Other Insurers", including Medicare Advantage Organizations. The 2026 Settlement Agreement, instead, contemplates the appointment of a "Healthcare Compliance Administrator."[33] The Healthcare Compliance Administrator has responsibility for creating "a mechanism for the identification and resolution of Liens" and to "review and verify information provided by Settlement Class Members."[34]

55. The 2026 Settlement Agreement provides few details about the actual "mechanism" that is to be employed to resolve liens held by MAOs (and many other types of medical lienholders). What is clear is that there is a proposed "allocation" process that would, without reviewing any actual medical lien information for the settling claimants, purport to allocate a claimant's recovery into medical and non-medical categories. This "allocation" will serve to place an artificial, "super cap" on lien recoveries and impair Humana's statutorily-based reimbursement rights, absent

[32] Settlement Agreement § 18.2 ("Procedures for Addressing Governmental Payors").

[33] Settlement Agreement § 18.2(a) ("Procedures for Addressing Governmental Payors").

[34] Settlement Agreement § 16.4(b) ("Roles and Responsibilities").

its agreement to do so.[35] As a result of the process that Monsanto has set up, Humana will likely be unable to recover its full lien. Monsanto has thus failed to provide for primary payment.

56. Because of the 2020 Roundup LRP, Monsanto and Bayer know that claimants in the 2026 Settlement likely have lien obligations to Humana and other MAOs but has taken no steps to establish an LRP for the Other Insurers like Humana.

57. The Roundup claimants also would release all claims related to the administration of the 2026 Settlement Agreement, including any decisions or findings by the Healthcare Compliance Administrator.[36]

58. On March 4, 2026, the court preliminarily approved the 2026 Settlement Agreement.[37]

59. On June 4, 2026, a number of parties, including a group of health plan payors and administrators, filed objections to the Settlement and requested leave to

---

[35] Settlement Agreement, § 18.2(g) ("The Healthcare Compliance Administrator shall be bound by any judicial or Settlement Special Master allocation of damages between medical and non-medical categories, and shall not permit reimbursement claims to exceed the portion allocated to medical expenses.").

[36] Settlement Agreement § 3.1(f) (Release of Claims Arising from the Settlement Agreement).

[37] *King v. Monsanto Co.,* No. 2622-CC00325, (Mo. Cir. Ct. St. Louis City Mar. 4, 2026).

be heard.[38] On July 15, 2026 Monsanto and class counsel filed papers responding to those objections. On July 29, 2026 many of the objectors filed reply papers. The Court has set a Fairness Hearing as to the settlement for September 14, 2026.

60. The number of potential claimants under the 2026 Settlement Agreement is substantial. Counsel for the proposed class reported that the settlement could cover more than 40,000 people, in both current and future claims.[39] Given the over 35 million Americans who are enrolled in Medicare Part C, combined with the fact that the majority of cancer patients are over the age of 65 and more likely to rely on a Medicare plan,[40] it is expected that Medicare Advantage Organizations, including Humana, have made payments on behalf of thousands of settling claimants.[41]

61. Upon information and belief, at least some of these payments were in fact made by Humana. While it is not possible to identify every settling claimant

---

[38] Objections of Health Plan Payors and Administrators to Settlement Agreement and Request for Leave to be Heard. *King v. Monsanto Co.,* No. 26-cv-813 (E.D. Mo. June 4, 2026).

[39] *See* Rachel Frazin, *Monsanto, Plaintiffs Seek $7.25B Settlement over Roundup Cancer Claims*, The Hill (Feb. 17, 2026), https://thehill.com/policy/energy-environment/5742532-monsanto-bayer-roundup-cancer-pesticides/.

[40] *See* Am. Cancer Soc'y Cancer Action Network, *2024 Cancer in Medicare: An American Cancer Society Cancer Action Network Chartbook*, at 6 (2024), https://www.fightcancer.org/sites/default/files/national_documents/acscan-medicare-chartbook.pdf.

[41] Kaiser Report, *supra* note 1.

from public records, it has been determined that Humana covers at least 14 individuals who have filed claims, are represented by class counsel, and who are part of the proposed settlement class. Many have already received (and are continuing to receive) medical care for NHL-related injuries for which Humana has current lien rights. There are almost certainly many dozens more.

**D. Monsanto and Bayer are "primary plans" who have, and will in the future, make settlement payments in connection with obtaining a release of liability.**

62. Monsanto and Bayer have, through agreements such as the 2020 Round Settlements, made payments to claimants injured by Roundup in exchange for which they obtained releases. And they plan to do so again through the two settlements covering 77,000 claims and the 2026 Settlement Agreement. Humana has provided medical benefits to many of those Roundup claimants.

63. Roughly 130,000 claimants have been submitted for lien resolution under the 2020 Roundup LRP. Based on a review of files from the 2020 Roundup LRP, there are over 10,000 Humana Medicare Advantage members who participated and who had their liens efficiently resolved for substantially less than their total value. The three more recent settlements, the two settlements concerning 77,000 claimants and the 2026 Settlement Agreement which contains both current and expected future claimants, are expected to cover over 110,000 additional claimants.

It is reasonable to expect that a similar number of Humana Medicare members will be settling claims under the 2026 Settlement Agreement.

64. Monsanto and Bayer are primary plans under the Medicare Secondary Payer Act because they carry their own risk.

65. For example, under the settlement agreement, "Monsanto will make declining capped annual payments for up to 21 years totaling up to 7.25 billion U.S. dollars."[42] Monsanto is thus funding the settlement itself.

66. Bayer is also a primary plan and is funding the settlement. Bayer planned for a negative free cash flow in 2026 and estimated litigation costs of $9.6 billion for Roundup. And, "to reflect the settlement agreements in the financial statements, Bayer is shifting its announcement of 2025 year-end financial results and 2026 guidance to March 4."[43]

67. Bayer's leadership has explicitly acknowledged that it is funding the settlement and that it has implications for Bayer's cash flow:

> on the litigation-related cash implications, which we expect to total approximately 5 billion euros in 2026. Under the proposed class settlement agreement, the largest of the annual payments would be funded this year. Additionally, we have to pay out settlements for both glyphosate, outside of the class, and PCBs in 2026.

---

[42] Bayer Feb. 2026 Press Release, *supra* note 24.

[43] *Id.*

> Therefore, we're expecting a negative free cash flow in 2026.[44]

68. Bayer's Chairman of the Board also explained that Bayer would have a negative free cash flow in 2026 due to litigation payouts, including the settlement.[45] And, Bayer included its payments for the settlement agreement in its Q2 2026 Financial Report.[46]

69. In fact, Bayer has been making provision in its Annual Reports for years related to resolving and funding Roundup litigation, most recently in 2025 for $11.3 billion.[47]

---

[44] Bayer Investor Update, *supra* note 23 (statement of Wolfgang Nickl, Chief Financial Officer).

[45] Bayer, *Address by Board of Management* (Mar. 4, 2026) https://www.bayer.com/media/en-us/address-by-board-of-management-2026-fnc/ (statement of Bill Anderson, Chairman of the Board of Bayer AG); *see also* Bayer, *Bayer Q2 Media Update* (Aug. 4, 2026), https://www.bayer.com/media/en-us/2026-q2-bayer-media-update-address-by-board-of-management/ (statement of Bill Anderson, Chairman of the Board of Bayer AG).

[46] Bayer, *Half-Year Financial Report Q2 2026* (June 30, 2026), https://www.bayer.com/sites/default/files/2026-08/bayer-half-year-financial-report-q2-2026.pdf.

[47] Bayer, *Annual Report 2022* (2022), https://www.bayer.com/sites/default/files/2023-02/Bayer-Annual-Report-2022.pdf ("As of December 31, 2022, Bayer had a provision of US$6.4 billion for the aforementioned settlements to resolve existing and future glyphosate claims"); Bayer, *Annual Report 2023* (2023),https://www.bayer.com/sites/default/files/2024-03/bayer-annual-report-2023.pdf ("As of December 31, 2023, Bayer's provision for the glyphosate litigation totaled US$6.3 billion"); Bayer, *Annual Report 2024* (2024), https://www.bayer.com/sites/default/files/2025-03/bayer-annual-report-2024.pdf ("As of December 31, 2024, Bayer's provision for the glyphosate litigation totaled US$5.9 billion"); Bayer, *Annual Report 2025* (2025),

70. Despite knowledge of Humana's medical benefits payments, neither Monsanto or Bayer has reimbursed Humana for payment of NHL-related medical expenses made on behalf of members exposed to Roundup, nor have they set aside settlement funds to satisfy those liens.

**E. Monsanto has failed to address its obligations to Medicare Advantage Organizations.**

71. Monsanto "must reimburse" the Medicare Advantage Organizations the full amount of the Roundup-related medical expenses advanced for their members' care.[48]

72. This obligation exists as to the 2020 Roundup Settlements, the two settlements covering 77,000 claims, and the 2026 Settlement Agreement, as well as

---

https://www.bayer.com/sites/default/files/2026-03/bayer-annual-report-2025.pdf ("As of December 31, 2025, Bayer's provision and liabilities for the glyphosate litigation totaled US$11.3 billion").

[48] 42 C.F.R. § 411.22(a) ("A primary payer, and an entity that receives payment from a primary payer, must reimburse CMS [and/or MAOs] for any payment if it is demonstrated that the primary payer has or had a responsibility to make payment.") (emphasis added). *See also* 42 C.F.R. § 411.22 (b):

> A primary payer's responsibility for payment may be demonstrated by—
>
> (1) A judgment;
>
> (2) A payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary payer or the primary payer's insured; or
>
> (3) By other means, including but not limited to a settlement, award, or contractual obligation.

any other settlement Monsanto or Bayer have entered to settle Roundup-related injury claims.

73. Although the 2026 Settlement Agreement recognizes that these obligations exist,[49] and counsel for Humana has specifically informed Monsanto of Humana's lien rights including through its objection to the proposed settlement, Monsanto has failed to provide a functional plan for resolving the Medicare Advantage Organizations' outstanding liens. For example, there is no definitive plan for identifying whether a lien exists, the amount of the lien, the identity of the lien holder, criteria for determining whether the lien should be compromised, and if the lien should be compromised, by how much.

74. And the process Monsanto and class counsel have attempted to set up rests upon an impermissible (and largely undefined) "allocation" of claimant recoveries which is proposed to serve as a hard cap on any lien recoveries. There is no legal basis upon which this "super-cap" can be imposed on MAOs to artificially limit their lien rights and Humana seeks a judgment from the Court that the "super-cap" cannot limit Humana's recovery rights.

---

[49] *See e.g.,* Settlement Agreement, Section 18.4: "In acknowledgement of the MSP Laws, the Parties acknowledge and agree that in reaching this Agreement, the Parties have considered the statutory interest of CMS in recovering conditional payments made for medical treatment that resulted directly from injuries allegedly caused by the use of Roundup Products."

75. The Medicare Secondary Payer Act requires Monsanto and Bayer to reimburse Humana. But, the 2026 Settlement Agreement purports to release Monsanto and Bayer from making those payments and attempts to place the financial burdens on individual claimants. Whereas Congress, in the 2003 amendments, rightly sought to ensure that tortfeasors responsible for injuring people would remain responsible for paying for the treatment their products caused, the 2026 Settlement Agreement seeks to upend this. By requiring the settling claimant to provide a full release and indemnification, the 2026 Settlement Agreement takes the financial onus of paying for medical care off the tortfeasor (*i.e.,* Monsanto) and places it on the shoulders of the injured claimant. Not only does such a result fly in the face of Congressional intent, but it is also patently unfair. Fairness requires ensuring that tortfeasors, who cause the injuries requiring treatment, remain obligated to ensure that payments made for those treatments be reimbursed.

76. This is a sharp departure from the normal process in mass tort settlements. Over the years, dozens of such settlements have implemented an LRP to provide a win-win-win solution for tortfeasors, injured claimants (and their attorneys), and health plans (including MAOs). LRPs provide a fair and efficient means for all parties to equitably resolve lien obligations, avoid protracted disputes, and ensure both that claimants obtain an actual recovery and health plans are compensated.

77. An LRP ensures that there is an orderly process for resolving liens and uniform criteria to promote fairness. Although there may be slight variations in certain terms, LRPs are almost completely standardized and are used in nearly every mass tort case whenever there are settlements of any sort, and certainly where there are settlements of this size ($7.25 billion) involving hundreds of millions of dollars in liens held by Medicare Advantage Organizations.

78. A typical LRP program begins with a mechanism whereby lists of all settling claimants, including detailed demographic information (full name, social security number, date of birth, address, etc.), are provided to the health plans. There is then a matching process through which health care companies use these claimant lists to identify plan members who have settled claims against a mass tort defendant. If the health plan cannot "match" a settling claimant to its member list within a specified period of time (typically ~90 days), all liens are waived. Once a claimant is "matched," the health plan identifies treatment it provided related to the type of injury being settled and establishes the amount of treatment it provided in connection with that injury – *i.e.,* the amount of the lien it has on any recovery.

79. A claims administrator then audits the liens on behalf of the participating claimants/law firms. Per the LRP's terms, disputes are limited to whether the claimed lien expense was actually incurred and whether the claimed lien expense is actually related to a compensable injury. This results in a streamlined,

definitive process by which the parties can get to an agreed lien amount for each matched claimant.

80. Importantly, the LRP also contains lien caps and reductions agreed to by the health insurers and designed to ensure that no claimant participating in the LRP gets zeroed out by a lien. These caps and reductions limit a claimant's lien exposure and ensure that they receive compensation for their injuries (regardless of how much money a health plan expended in treating those injuries). For example, a lien cap is set to ensure that no claimant is forced to pay more than a defined percentage (often 25%) of their settlement recovery. A lien reduction percentage (sometimes called a lien offset) provides for the health plan to reduce the lien amount by a specified amount. Also, liens (regardless of their size) are often waved completely as to claimants whose settlement recovery is *de minimis*. In this way, the claimants are protected from a situation where the lien obligations relating to the treatment of the injuries exceeds the injured party's recovery under the mass tort settlement.

81. Often, the claimants and law firms also agree to set aside a percentage of the recovery and that money does not get paid out until the lien(s) are dealt with.

82. Monsanto is well aware of the manner in which a traditional LRP works, as the 2020 Roundup LRP has efficiently resolved lien rights for over one hundred thousand claimants under that prior settlement.

83. Monsanto's proposal for addressing the Medicare Advantage Organizations' liens here lacks any of the hallmarks of a lien resolution program. Instead, Monsanto proposes to shift its obligations under the Medicare Secondary Payer Act onto individual cancer patients to provide the relevant information regarding the liens of Medicare Advantage Organizations (referred to in the Settlement as "Other Insurers"[50]); and to then have a Healthcare Compliance Administrator use unspecified "reasonable" efforts to verify that information is correct, before extinguishing Medicare Advantage Organizations' liens:

> As a condition of applying for and receiving an Award, **a Settlement Class Member must: (i) identify** in writing every Governmental Payor or **Other Insurer** that may have made any payments on behalf of the Settlement Class Member . . . arising from, resulting from, in any way relating to or in connection with such Settlement Class Member's NHL or such Person's NHL; and **(ii) represent and warrant** in writing he or she has **used best efforts to identify such** Governmental Payors or **Other Insurers**. The Healthcare Compliance Administrator must take reasonable steps to affirmatively verify such information, or lack thereof, with any Governmental Payor or Other Insurer from which Settlement Class Members are or were entitled to benefits pursuant to those programs, including, where applicable, transmitting an eligibility query and

[50] "Other Insurers" is defined as "any Person other than a Governmental Payor, a provider, a patient, or a relative or guardian of a patient that is obligated, under contract, agreement or otherwise, to pay health care costs of a Settlement Class Member, including, without limitation, a self-insured plan operated by an employer or a corporate or association health insurer or liability insurer." Settlement Agreement, Section 1.1(83).

data to CMS to obtain from CMS a Medicare eligibility determination for each Settlement Class Member.[51]

84. Monsanto is well aware of Humana's lien rights concerning its Medicare Advantage members who are receiving settlement awards under the settlement. Humana is one of the largest MAOs in the country and was a participant in the 2020 Roundup LRP. Humana was also one of the health plans who filed an objection on June 4, 2026 to the 2026 Settlement Agreement, which made clear to Monsanto and Bayer that Humana had lien rights that the 2026 Settlement Agreement purported to impact. Despite this, neither Monsanto nor Bayer has taken any steps to ensure that Humana be fully reimbursed.

85. Monsanto could have set forth a proper lien resolution program for Medicare Advantage Organizations, just as it has done for Government Payors.[52] And as it did in the 2020 Roundup LRP. Having failed to do so, and by forcing MAOs to make conditional payments that are not being reimbursed, Monsanto has caused concrete and ongoing injury to the MAOs. This injury to the MAOs is directly

[51] Settlement Agreement, Section 18.1(b).

[52] *See* Section V.A., *supra.* "Government Payor" is defined as "(a) any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the U.S. Department of Veterans Affairs, and the Indian Health Service, and (b) any entity paid by such a plan, program, or entity to provide benefits under contract on a prepaid or capitated basis." Settlement Agreement, Section 1.1(62).

traceable to Monsanto's Roundup product as reflected by the 2026 Settlement Agreement.

86. Monsanto and Bayer cannot avoid their obligations under the Medicare Secondary Payer Act by attempting to negotiate away Humana's ability to be properly compensated. And the 2026 Settlement Agreement's attempt to force Humana to instead pursue individual claimants (without the benefits of the caps and reductions present in LRPs) to enforce their lien rights is improper.

87. As a result, under the MSP, Monsanto owes Humana double damages arising from Monsanto's failure to reimburse Humana for the expenditures it made to pay for treatment of the Monsanto-caused NHL for any of its covered Medicare Advantage members who have settled Roundup-related claims with Monsanto or Bayer.

## VI. CLAIMS

### COUNT I
### PRIVATE RIGHT OF ACTION UNDER 42 U.S.C. § 1395y(b)(3)(A)

88. Humana incorporates by reference the allegations of the preceding paragraphs of the Complaint as if set forth herein.

89. Humana is a "Medicare Advantage Organization" that manages "Medicare Advantage Organization Plans."

90. Humana made payments of Medicare benefits for treatment of injuries suffered by its members that were covered by various settlement agreements entered

into by Monsanto or Bayer, including the NHL-related care covered by the 2026 Settlement Agreement. At least 28 specific individual Humana Medicare Advantage members have been identified to date, and Monsanto and Bayer have, or can get, information identifying many more.

91. Certain identified and many more unidentified Roundup claimants are Medicare beneficiaries who enrolled in Humana's Medicare Advantage plans and on whose behalf Humana advanced conditional payments for medical treatment of the members' Roundup-related injuries.

92. Monsanto and Bayer are each a "primary plan" with respect to the settlement payments they have made and continue to make under the various settlement agreements referred to above, including but not limited to the 2026 Settlement Agreement, for Roundup claimants enrolled in Medicare Advantage plans.

93. Monsanto and Bayer have made and, upon information and belief, are continuing to make, such payments in exchange for compromises, waivers and releases that purport to extinguish claimants' Roundup-related claims with respect to the costs of NHL-related medical treatments.

94. Monsanto has not reimbursed, created a functional system to reimburse, or set aside money sufficient to reimburse Humana from monies paid under any of

the 2020 Settlements, other individual law firm settlements, the 2026 Roundup Settlement or otherwise.

95. Congress established a private cause of action under 42 U.S.C. § 1395y(b)(3)(A), which permits Humana to recover double damages from the Monsanto and Bayer due to their failure to make appropriate reimbursement in accordance with the Medicare Secondary Payer Act as to settlements reached with Roundup claimants.

96. Humana brings the private cause of action established by 42 U.S.C. § 1395y(b)(3)(A) to recover from Monsanto and Bayer double damages for its failure to make appropriate reimbursement as required by law.

97. Under this private right of action, Humana is entitled to recover "an amount double the amount otherwise provided."

## COUNT II
## DECLARATORY JUDGMENT AS TO DEFENDANTS' OBLIGATION TO REIMBURSE MEDICARE BENEFITS

98. Humana incorporates by reference the allegations of the preceding paragraphs of the Complaint as if set forth herein.

99. Under the terms of health benefit plans and the Medicare Secondary Payer Act, Humana has liens against any recovery made by a Roundup claimant for whom Humana provided medical treatment for Roundup-related injuries.

100. Monsanto and Bayer have been aware of the existence of these liens for many years, yet in many cases have refused and continue to refuse to recognize or honor these liens, refused to cooperate with Humana to resolve these liens, and refused to provide information available to them that would assist Humana in protecting its reimbursement rights.

101. Accordingly, pursuant to 28 U.S.C. §2201, *et seq.* and Fed. R. Civ. Proc. 57, Humana is entitled to declaratory relief concerning their rights to be reimbursed out of any portion of a recovery made by a Roundup claimant. Specifically, Humana seeks a Declaration as follows:

a. Humana has rights to reimbursement as to any conditional payments it made, or as to health benefits it otherwise provided, on behalf of any Roundup claimant, whether identified to date or in the future;

b. Defendants Monsanto and Bayer are primary plans within the meaning of 42 U.S.C. § 1395 with respect to payments made or to be made to Roundup claimants who are or were enrolled in Medicare Advantage plans;

c. Defendants' responsibility, pursuant to 42 C.F.R. § 411.22(b), to make payment is "demonstrated" by payments conditioned on the waiver or release of Roundup-related claims under the Settlement Agreement Humana has reimbursement and recovery rights under the provisions of its MAO plan and the applicable MSP Act;

d. Humana, as an MAO, has advanced conditional payments for NHL-related care of its members who were exposed to Roundup and is entitled to reimbursement from Defendants under 42 U.S.C. §§1395y(b)(2) and 1395y(b)(3)(A);

e. The 2026 Settlement Agreement, including but not limited to the proposed "allocation" process does not alter, impair, or otherwise

impact Humana's statutory rights, including its right to recovery from Monsanto or Bayer;

f. Monsanto and Bayer have paid, and will continue to pay, monies into a settlement fund for the benefit of Humana Medicare Advantage members;

g. When an MAO, such as Humana, has advanced conditional Medicare benefits in circumstances in which its payments are made secondary pursuant to 42 U.S.C. §§1395y(b)(2) and 1395w-22(a)(4), it is entitled to pursue reimbursement from a primary plan or entity that received payment from a primary plan under 42 U.S.C. § 1395y(b)(3)(A);

h. Humana is entitled to disclosure of the identities, including names and basic demographic information, of each Roundup claimant to whom Monsanto or Bayer have made, or in the future make, a settlement payment;

i. Humana is entitled to receive payment in full satisfaction of its liens for any conditional payments it made, or as to any health benefits it otherwise provided, on behalf of any Roundup claimant who received settlement proceeds from Monsanto or Bayer and who fails to satisfy their lien obligations to Humana; and

j. Defendants are liable for double damages under 42 U.S.C. 1395 for their failure to provide for primary payment.

102. Declaratory relief is necessary and appropriate because the defendants have refused to comply with their obligations under the Medicare Secondary Payer Act.

## DEMAND FOR JUDGMENT

Humana seeks judgment awarding it the following relief:

(1) An order declaring that:

a. Humana has rights to reimbursement as to any conditional payments it made, or as to health benefits it otherwise provided, on behalf of any Roundup claimant, whether identified to date or in the future;

b. Defendants Monsanto and Bayer are primary plans within the meaning of 42 U.S.C. § 1395 with respect to payments made or to be made to Roundup claimants who are or were enrolled in Medicare Advantage plans;

c. Defendants' responsibility, pursuant to 42 C.F.R. § 411.22(b), to make payment is "demonstrated" by payments conditioned on the waiver or release of Roundup-related claims under the Settlement Agreement Humana has reimbursement and recovery rights under the provisions of its MAO plan and the applicable MSP Act;

d. Humana, as an MAO, has advanced conditional payments for NHL-related care of its members who were exposed to Roundup and is entitled to reimbursement from Defendants under 42 U.S.C. §§1395y(b)(2) and 1395y(b)(3)(A);

e. The 2026 Settlement Agreement, including but not limited to the proposed "allocation" process does not alter, impair, or otherwise impact Humana's statutory rights, including its right to recovery from Monsanto or Bayer;

f. Monsanto and Bayer have paid, and will continue to pay, monies into a settlement fund for the benefit of Humana Medicare Advantage members;

g. When an MAO, such as Humana, has advanced conditional Medicare benefits in circumstances in which its payments are made secondary pursuant to 42 U.S.C. §§1395y(b)(2) and 1395w-22(a)(4), it is entitled to pursue reimbursement from a primary plan or entity that received payment from a primary plan under 42 U.S.C. § 1395y(b)(3)(A);

h. Humana is entitled to disclosure of the identities, including names and basic demographic information, of each Roundup claimant to whom Monsanto or Bayer have made, or in the future make, a settlement payment;

i. Humana is entitled to receive payment in full satisfaction of its liens for any conditional payments it made, or as to any health benefits it otherwise provided, on behalf of any Roundup claimant who received settlement proceeds from Monsanto or Bayer and who fails to satisfy their lien obligations to Humana; and

j. Defendants are liable for double damages under 42 U.S.C. 1395 for their failure to provide for primary payment.

(2) Reimbursement for all conditional payments made by Humana in connection with the Roundup-related injuries sustained by any of its covered members who are settling claimants under the Settlement Agreement.

(3) Double damages under 42 U.S.C. § 1395y(b)(3)(A) in an amount to be determined as to all monies paid or expended by Humana related to the treatment or care of any NHL injury for any of its covered members who are settling claimants under the Settlement Agreement;

(4) Pre- and post-judgment interest;

(5) Reasonable attorneys' fees and costs; and

(6) Such other relief the Court deems proper.

WHEREFORE, Humana prays that the Court enter judgment on behalf of Humana and against Monsanto and Bayer and award Humana all requested relief.

Dated: September 3, 2026

/s/ James E. Cecchi
James E. Cecchi
Donald A. Ecklund
Kevin G. Cooper

CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, PC
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com
decklund@carellabyrne.com
kcooper@carellabyrne.com

Thomas M. Sobol
Gregory T. Arnold
HAGENS BERMAN SOBOL
SHAPIRO LLP
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Tel: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
grega@hbsslaw.com

Mark D. Fischer
Rob C. Griffith
RAWLINGS & ASSOCIATES, PLLC
1 Eden Parkway
La Grange, KY 40031
Tel: (502) 814-2139
mfischer@rawlingslegal.com
rgriffith@rawlingslegal.com

Gerald Lawrence
Renee A. Nolan
LOWEY DANNENBERG, P.C.
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Tel: (215) 399-4770
glawrence@lowey.com
rnolan@lowey.com